## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

| | | |
|---|---|---|
| PAMELA LITTRELL, as Independent Administrator of the ESTATE OF CHRISTIAN LITTRELL, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| WINNEBAGO COUNTY SHERIFF GARY CARUANA; BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS; BROOKE MECHLING; VALERIE KIDD; AMY HALL; RYAN VANDENBUSCH; CAROLINE Z.; MICHAEL MARCHINI; and WINNEBAGO COUNTY, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiff, Pamela Littrell, as Independent Administrator of the Estate of Christian Littrell, through her attorneys, Kaplan & Grady LLC, hereby complains of Defendants Winnebago County Sheriff Gary Caruana, Board of Trustees of the University of Illinois, Brooke Mechling, Valerie Kidd, Amy Hall, Ryan Vandenbusch, Caroline Z., Michael Marchini, and Winnebago County, stating as follows:

## INTRODUCTION

1. On August 9, 2022, Christian Littrell died alone in his cell at the Winnebago County Jail ("WCJ") after Defendants repeatedly ignored his acute and worsening health needs while he was in their care.

2.      When Christian arrived at WCJ on the morning of August 7, he presented with clear signs of withdrawal, and soon began vomiting. He did not eat and continued to vomit persistently throughout the next two days he was in WCJ custody.

3.      Defendants were well aware of Christian's rapidly deteriorating health condition while at WCJ. Defendants Mechling and Kidd even noted in his medical records on the day he died that he was suffering from withdrawal. Despite this knowledge, Defendants Mechling, Kidd, Hall, Vandenbusch, and Caroline Z. did not refer Christian to an emergency department so that he could receive the emergency medical treatment he so desperately needed, nor did they consult with a medical provider to ensure that Christian's obvious and serious medical needs were addressed. Instead, they provided no treatment whatsoever.

4.      On the day he died, Christian was supposed to be monitored by correctional staff every fifteen minutes. However, by the time Defendant Marchini checked on him, his "[f]inger and toe nail beds were blue and cool to touch." He had been dead for some time.

5.      Christian was deeply loved by his mother and sister (and, before he died, by his father as well). He was very spiritual and enjoyed attending church with his mother. His family misses him every day.

6.      Plaintiff accordingly brings this suit pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, the Rehabilitation Act, and related state-law claims to pursue accountability for the cruelty and misconduct that caused Christian's death.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

8.      Venue is proper under 28 U.S.C. § 1391(b) because, on information and belief, one or more of the Defendants reside in this judicial District, and a substantial portion of the events giving rise to the claims asserted herein occurred within this District.

## PARTIES

9.      Plaintiff Pamela Littrell is the duly appointed Independent Administrator of the Estate of Christian Kier Littrell. The Estate was filed in the Circuit Court of the 17th Judicial District in Winnebago County.

10.      At all relevant times, Christian Littrell was detained at WCJ.

11.      Defendant Gary Caruana is the Sheriff of Winnebago County. He is sued here in his official capacity as Sheriff. At all times relevant to the events at issue in this case, the Winnebago County Sheriff's Department was responsible for the health and safety of people detained at WCJ.

12.      Defendant Board of Trustees of the University of Illinois is the body that governs the University of Illinois College of Medicine ("U of I"), which provides medical care services to people detained at WCJ pursuant to a contract. As an agent of the Winnebago County Sheriff's Department, the Board was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including Defendants Mechling, Kidd, Hall, Vandenbusch, and Caroline Z.

13.      Defendants Brooke Mechling, Valerie Kidd, Amy Hall, Ryan Vandenbusch, and Caroline Z. ("the Defendant Nurses") were at all relevant times, nurses employed to work at WCJ. They are sued here in their individual capacities. At all times relevant to the events at issue in this case, these Defendants were acting under color of law and within the scope of their employment.

14.     Defendant Michael Marchini was at all relevant times a correctional officer at WCJ. He is sued here in his individual capacity. At all times relevant to the events at issue in this case, this Defendant was acting under color of law and within the scope of his employment at WCJ.

15.     Defendant Winnebago County is a municipality that is obligated to pay any judgment against Defendant Caruana and any other employee or agent acting within the scope of their employment. It is named for purposes of indemnification only.

## ALLEGATIONS

16.     Christian was born in Freeport and raised in Rockford, Illinois, where he grew up playing basketball at the local Boys and Girls Club.

17.     He loved his mother's homemade apple cake and fudge brownies, was his family's best Trivial Pursuit player, and was a passionate sports fan, especially of his beloved Chicago Bulls.

18.     Christian was also deeply spiritual and often carried a bible. He enjoyed going to church with his mom and they bonded over a song about God leaving ninety-nine sheep in search of a single sheep that went missing and needed help. Christian felt like he was that lost sheep.

### Christian Had Opioid Use Disorder, which He Worked Hard to Address with Medication for Opioid Use Disorder (MOUD)

19.     Christian suffered from opioid use disorder ("OUD"), a chronic, relapsing brain disease that, if left untreated, often results in death. OUD breaks down an individual's dopamine system. Dopamine is a neurotransmitter that plays a key role in feeling pleasure, movement, memory, and other body functions. Dopamine is necessary for the brain to feel a sense of normalcy and to perform cognitive functions necessary for survival. People who have dopamine level changes due to OUD have difficulty enjoying life activities and feeling normal, and often experience depression, anxiety, and irritability.

20.     OUD causes individuals to suffer powerful cravings for and compulsive use of opioids despite the negative consequences, decreased sensitivity to opioids, and excruciating pain and suffering from withdrawal. Continued use of opioids does not indicate a person lacks willpower, but rather is the predictable outcome of chemical changes in the brain that cause uncontrollable opioid cravings. People with this brain disorder thus cannot simply "will" or "reason" their way out of continued opioid use, even when they are aware of the dire consequences.

21.     Christian worked hard to address and control his OUD with doctor-prescribed Suboxone. Suboxone is a medication for opioid use disorder ("MOUD"). MOUD alleviates opioid withdrawal, decreases opioid use, reduces the risk of relapse and overdose death, and improves treatment retention. While treatment for OUD can consist of MOUD combined with counseling and other behavioral therapies, MOUD is the primary driver of efficacy.

22.     The Food and Drug Administration has approved three types of MOUD: methadone, buprenorphine, and naltrexone. Suboxone is a form of buprenorphine. MOUDs (and the different variations of each) are not the same and cannot be used interchangeably for every patient.

23.     Buprenorphine is an agonist, which means that it activates opioid receptors in the brain to relieve withdrawal symptoms and control opioid cravings. Because buprenorphine binds to the opioid receptors it stimulates, it blocks the receptors from being activated by other opiates or opioids. This means that patients cannot get "high" from illicit drugs like heroin and fentanyl while on these medications. This, in turn, trains opioid receptors in the brain that are negatively impacted by OUD to gradually decrease their response and interest in opioids (a process known as extinction learning).

24. The American Medical Association ("AMA"), the American Society of Addiction Medicine, the U.S. Department of Health and Human Services, the Food and Drug Administration, the National Institute on Drug Abuse, the White House Office of National Drug Control Policy, the Substance Abuse and Mental Health Services Administration ("SAMHSA"), and the World Health Organization all endorse the critical role of MOUD—specifically methadone and buprenorphine—in addressing OUD. The World Health Organization, for example, has designated methadone and buprenorphine as an "essential medicine."[1] And SAMHSA has determined that MOUD medications are "evidence-based treatment options" that "relieve the withdrawal symptoms and psychological cravings that cause chemical imbalances in the body."[2]

25. According to the AMA, MOUD is the well-accepted "standard of care for patients in jail and prison settings."[3] And the U.S. Department of Justice ("DOJ") has made clear that ensuring MOUD access in the criminal legal system is a top priority. The third element of the DOJ's 2022-2026 Strategic Plan to address the nation's drug and overdose crisis is making sure that incarcerated people receive the MOUD they need and are entitled to under the nation's civil rights laws and constitutional protections.[4] Many other law enforcement and correctional groups have similarly recognized the necessity of providing MOUD within a correctional setting,

---

[1] World Health Organization, *Opioid agonist pharmacotherapy used for the treatment of opioid dependence maintenance*, https://www.who.int/data/gho/indicator-metadata-registry/imr-details/2718 (last visited Aug. 6, 2024).

[2] SAMHSA, *Medications, Counseling, and Related Conditions*, https://www.samhsa.gov/medications-substance-use-disorders/medications-counseling-related-conditions (last visited Aug. 6, 2024).

[3] American Medical Association, *AMA Calls for Access to Substance Use Disorder Treatment in Prisons, Jails* (2021), https://www.ama-assn.org/press-center/press-releases/ama-calls-access-substance-use-disorder-treatment-prisons-jails (last visited Aug. 6, 2024).

[4] U.S. Dep't of Just., *FYs 2022-2026 Strategic Plan* 33, https://www.justice.gov/doj/book/file/1516901/download (last visited Aug. 6, 2024).

including the U.S. Bureau of Prisons, the American Correctional Association, the National Sheriffs' Association, and the National Commission on Correctional Health Care.

26.     Christian made progress in his recovery several times throughout his battle with OUD. Before his death, he had multiple periods of recovery, including one where he excelled in robotics classes at his local community college and worked a job in robotics manufacturing. He used methadone for some time, and ultimately found that Suboxone was a good fit for him. For many months leading up to his death, his mother regularly drove him to his monthly appointments at his Suboxone clinic in Rockford.

### Defendants Refused Plaintiff Access to MOUD at WCJ
### Despite Knowing that He Suffered from OUD

27.     Christian was taken to WCJ on the morning of August 7, 2022. Upon arrival, he reported to Defendant Hall, a nurse, that he had a current prescription for Suboxone. Defendant Hall noted Christian's report in a medical intake form.

28.     Christian also reported a current prescription for gabapentin, a medication that is often prescribed to treat seizures, nerve pain, and anxiety, and a recent unfinished course of antibiotics during a recent hospitalization at Saint Anthony's Hospital for cellulitis and MRSA.

29.     In the hours and days that followed, Defendants Mechling, Kidd, Vandenbusch, and Caroline Z., nurses at WCJ, were similarly made aware that Christian had a prescription for Suboxone. Yet none of the Nursing Defendants took any meaningful action to ensure that Christian continued to receive Suboxone while at WCJ. They did not contact Christian's pharmacy to verify his medications, even though they knew which pharmacy he went to. And they did not ensure that a provider examined Christian to determine whether his Suboxone and/or gabapentin should be continued even if the medications were not or could not be verified.

30.     Defendants also failed to conduct a urine drug screen, which is necessary to indicate what substances are present (and potentially dangerous) in a new patient's system. Urinalysis is standard and necessary as part of the intake process for people with OUD to safely assess the risks of withdrawal and overdose, as well as treatment needs.

31.     As a result of the Nursing Defendants' actions and refusals to act, Christian was denied access to Suboxone and any other MOUD.

32.     Forced and abrupt cessation of opioids or MOUD (also known as forced detoxification) often triggers painful withdrawal symptoms that markedly increase the risk of relapse, overdose, and death. It is so traumatic on the body that it can cause pregnant women to miscarry and lead to other life-threatening complications.

33.     The physical and mental symptoms of forced detoxification are often crushing. They include bone and joint aches, nausea, vomiting, diarrhea, fever, excessive sweating, hypothermia, hypertension, tachycardia, depression, anxiety, dysphoria, and insomnia. (Forced withdrawal or failure to continue gabapentin often causes intense and painful withdrawal symptoms as well.)

34.     These symptoms can last for weeks or months and lead to life-threatening complications—even apart from the risk of relapse and overdose—including pneumonia and fatal dehydration.

35.     Numerous medical and law enforcement organizations warn against forced detoxification without the provision of MOUD and the abrupt cessation of MOUD because doing so elevates the risk of harm to the patient and is a barrier to treatment and recovery. The Centers for Disease Control and Prevention, for example, strongly cautions against abrupt discontinuation

from opioid therapy, noting that forced detoxication without MOUD increases the risk of harm to the patient, including death.[5]

36. The risk of substantial harm posed by forced detoxification from opioids or MOUD is even greater when the patient has certain co-morbidities, including, for example, cardiac issues. That is because opioid and MOUD withdrawal is known to trigger a variety of heart complications, including hypertension (elevated blood pressure), tachycardia (elevated pulse), stress cardiomyopathy (an acute weakening of the heart muscle brought on by stress to the body), and potentially acute coronary syndrome (a sudden reduction in the blood flow to the heart).

37. The risks posed by forced detoxification are well known in the medical community and, on information and belief, Defendants were aware of them during Christian's detention at WCJ in August 2022. Despite this knowledge, Defendants took no meaningful action to ensure that Christian did not suffer the known and substantial risks of harm posed by forced detoxification. As a result, Christian died.

### Christian Suffered from Severe Withdrawal at WCJ but Defendants Refused to Provide Him Care

38. Shortly after his arrival at WCJ, the Nursing Defendants and other staff at WCJ observed that Christian was displaying signs of withdrawal, including persistent vomiting. Vomiting is a well-known symptom of withdrawal and indicates a medical emergency when it is persistent and accompanied by an inability to keep down food or fluids. Additionally, persistent

---

[5] Centers for Disease Control and Prevention, *Overdose Prevention*, https://www.cdc.gov/overdose-prevention/hcp/clinical-care/opioid-use-disorder-treating.html#:~:text=Detoxification%20on%20its%20own%2C%20without,%2C%20overdose%2C%20 and%20overdose%20death (last visited Aug. 6, 2024).

vomiting is itself dangerous, as it can cause dehydration—particularly when accompanied by an inability to keep down food or fluids.

39.     Christian continued to vomit throughout the day on August 7 and August 8. The Nursing Defendants were aware of Christian's persistent vomiting, including during encounters in the afternoon of August 7 (with Defendant Vandenbusch) and the early morning hours of August 8 (with Defendant Mechling). The persistent vomiting continued to the morning of August 9, including during an encounter with Defendant Caroline Z. That same morning, Defendants Mechling and Kidd noted that Christian's vomiting was a result of his withdrawal from Suboxone.

40.     During this same period of time, on information and belief, Christian was unable to keep down food or fluids and had nothing to eat for more than two days.

41.     Given that Defendants knew that Christian suffered from OUD and was prescribed Suboxone, his continuous vomiting without being able to keep down food or fluids while at WCJ was an obvious and unambiguous sign of the need to medically evaluate and urgently treat his worsening health.

42.     But the Nursing Defendants took no meaningful action to ensure that Christian was provided MOUD or any other treatment to address his serious and deteriorating medical condition. They did not send him to an emergency department. They did not ensure that he was evaluated by a provider. They did not offer Christian an over-the-counter anti-emetic like Zofran. They did not even offer him electrolytes, which he desperately needed after his continuous vomiting. Instead, Christian received no care or treatment whatsoever.

43.     On the morning of August 9, the day Christian died, , WCJ staff placed him in a camera-monitored cell. But on information and belief, no one at WCJ actually monitored the feed from Christian's cell, rendering the move to the monitored cell virtually worthless. And no

meaningful effort was made to ensure that Christian received actual treatment for (rather than simple observation of) the obvious medical emergency he was currently experiencing.

44. Defendant Marchini, a correctional officer at WCJ, was assigned to monitor the living unit where Christian was assigned on the evening of August 9. From 5:56 PM to 8:28 PM that evening, Defendant Marchini conducted rounds approximately every fifteen minutes. He saw Christian laying on his bed without moving for more than 2.5 hours. During each of these rounds, Defendant Marchini had the ability and responsibility to check on Christian to ensure that he was safe. But for more than 2.5 hours, Defendant Marchini ignored this responsibility. It was only at 8:56 PM that he finally opened the door to Christian's cell in an attempt to "raise" him. But it was too late. By that point, Christian had become non-responsive and efforts to revive him failed.

45. Christian's death was eminently avoidable, had Defendants taken action to ensure that Christian was not forced to face a substantial risk of serious harm without any help from those, including Defendants, who are responsible to protect him. Because of Defendants' gross misconduct, however, Christian died a painful death alone and without assistance from anyone at WCJ.

### Defendants Caruana's and U of I's Policies were
### One of the Causes of Christian's Death

46. Pursuant to their contract, medical care at WCJ is provided by the U of I, and the U of I is accordingly a final policymaker on the topic of medical care at WCJ. The policies in place governing medical care at WCJ are woefully inadequate and inappropriate and violate both the Constitution and federal law.

47. First, Defendants' policies did not allow for MOUD at WCJ. That is grossly inappropriate and dangerous. Treatment with MOUD—specifically, buprenorphine—would have

11

prevented and/or addressed Christian's withdrawal symptoms, treated his underlying OUD, and substantially decreased his risk of death.

48.     Indeed, Defendants' policies on substance use disorders generally are bare bones and omit proper medical procedure related to OUD. They do not discuss provision of even the most basic comfort medications, including over-the-counter medications like an anti-emetic or Tylenol, during withdrawal, which can help to remedy common symptoms such as body aches, diarrhea, and vomiting. They do not discuss completion of the Clinical Opiate Withdrawal Scale test, which is a widely accepted test to determine the severity of an OUD patient's withdrawal symptoms. And they do not provide any assessment whatsoever to determine an OUD patient's opioid dependence level. These failures are shocking and absolutely unacceptable, especially considering the high number of people who enter a correctional setting with OUD, and the Winnebago County's disproportionately high number of people dying of overdoses compared with the rest of the counties in the state (ranking third highest with a rate of 47.7 opioid fatalities per 100,000 capita in 2022).[6]

49.     OUD is a protected disability under the Americans with Disabilities Act and Rehabilitation Act, and denying people access to medication for this disorder violates these federal laws.

50.     Defendants' policies state vaguely that medical staff must ensure that people "exhibiting symptoms of alcohol or drug withdrawal . . . are referred immediately for care and medical clearance into the facility"—a policy that was obviously not followed in Christian's case. But it is only patients who experience alcohol and sedative withdrawal that Defendants' policies

---

[6] Statewide Semiannual Overdose Report, Illinois Department of Public Health (2023), available at semiannual-overdose-report_102023.pdf (illinois.gov) (last visited August 6, 2024).

permit to be transferred to an acute setting for treatment. The policy makes no such provision for patients with OUD, like Christian.

51.     Finally, Defendants' policies require WCJ staff to obtain an opiate history only for *pregnant* OUD patients, despite the fact that such a history is necessary and important to provide care for *all* OUD patients, regardless of their pregnancy status.

52.     Similarly, Defendants' policies regarding medications reported by detainees at booking do not permit patients to receive MOUD even if they report a current, active prescription for MOUD at the time of booking and the medication is verified.

53.     These policies are unconstitutional and discriminatory against individuals with OUD, in violation of the Americans with Disabilities Act and the Rehabilitation Act. And in the case of Christian Littrell, they had a predictable effect: Christian Littrell was denied MOUD, suffered severe withdrawal that included persistent vomiting, and died after approximately two days. If Christian had been provided the MOUD that he needed, or been provided the most basic medical attention, he would still be alive today.

54.     Christian was not the only person who died under WCJ and U of I's custody and care in recent years. Between 2022 and 2023 alone, at least four other people died in WCJ's custody. David Reimann, 53, died in his cell at WCJ in April 2022. Mildred Maclin, 62, died on November 2, 2022, after being transported to the hospital from WCJ. Ted Wise was found dead in his cell on November 6, 2022, after suffering from alcohol withdrawal. Kayla McGavran, 30, was found unresponsive in her cell and pronounced dead in April 2023.

## COUNT I
### 42 U.S.C. § 1983 - Fourteenth Amendment
### All Individual Defendants

55.     Each of the Paragraphs of this Complaint is incorporated herein.

56.     At all relevant times, Plaintiff suffered from one or more objectively serious medical conditions.

57.     In the manner described more fully above, Defendants were aware of Christian's Suboxone prescription, OUD medical needs, withdrawal, recent infection history, continuous vomiting and knew the risk of harm he faced without appropriate medical care. Despite this knowledge, Defendants failed to provide him with adequate medical care or access to medical care, in violation of the Fourteenth Amendment to the United States Constitution.

58.     The actions and decisions not to act were done purposefully, knowingly, or at least recklessly, and were objectively unreasonable. Defendants did not take reasonable available measures to address the substantial risk of harm that they knew Christian faced at WCJ.

59.     As a result of Defendants' unjustified and unconstitutional conduct, Christian experienced injuries, including but not limited to pain, suffering, emotional distress, and preventable death.

## COUNT II
### 42 U.S.C. § 1983 - *Monell* Claim (Fourteenth Amendment)
### Defendant Caruana

60.     Each of the Paragraphs of this Complaint is incorporated herein.

61.     The violations of Christian's rights under the Fourteenth Amendment to the United States Constitution, and the injuries and eventual death that he suffered as a result were proximately caused by the policies and practices of Defendant Caruana, in his official capacity as Sheriff.

62.     At all times relevant to the events at issue in this case, Defendant Caruana contracted with the U of I to provide medical healthcare to people, including Christian, housed at the WCJ. In doing so, Defendant Caruana delegated final policymaking authority to the U of I and

14

adopted policies promulgated by the U of I as the policies of the Winnebago County Sheriff's Department.

63.     As discussed more fully above, those policies were objectively unreasonable and put patients with OUD like Christian at substantial risk of serious harm. A reasonable and responsible person in the position of the Winnebago County Sheriff's Department and the U of I (as Defendant Caruana's designated final policymaker) would know that such policies were inappropriate and unconstitutional, and put detainees in their care at risk of serious harm. Among other reasons and as described more fully above, Winnebago County has some of the highest rates of overdoses from opioid use in the state. Despite that knowledge, Defendant Caruana (in his official capacity) did not take reasonable available measures to abate the known and obvious risk.

64.     The actions and decisions not to act of Defendant Caruana and the final policymakers to whom final policymaking authority was delegated were done purposefully, knowingly, or at least recklessly.

65.     In addition, there existed at WCJ policies or widespread practices pursuant to which incarcerated and detained people there received unconstitutionally inadequate healthcare, including policies and practices pursuant to which WCJ staff: (1) failed to provide continuity of care between and amongst medical and correctional staff; (2) failed to maintain appropriately complete and accurate records reflecting a patient's medical needs and care; (3) failed to communicate with providers, even when such communication was critical to patient care; (4) failed to adequately evaluate, address, and treat OUD, and to protect patients known to have OUD from facing a substantial risk of serious harm; (5) failed to train correctional and medical staff about the needs of individuals with OUD; and (5) failed to provide adequate staffing, even when it was known that additional staffing was necessary to keep detainees like Christian safe.

66.    Prior to the events giving rise to Plaintiff's Complaint, the Winnebago County Sheriff's Department was on notice of these policies or widespread practices. Yet the Department did nothing to modify or correct these policies or widespread practices to ensure that patients, like Christian, received adequate access to care for any of their medical needs.

67.    The above-described practices, so well-settled as to constitute de facto policy within WCJ, were able to exist and thrive because the Winnebago County Sheriff's Department was deliberately indifferent to the problem, thereby effectively ratifying it. In this way, the Department directly encouraged the very type of misconduct at issue in this case and violated Christian's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

68.    Christian's injuries were caused by Defendant Caruana, including but not limited to the individually named Defendants who acted pursuant to the foregoing policies and practices and in engaging in the misconduct described above.

### COUNT III
**42 U.S.C. § 1983 – Failure to Protect (Fourteenth Amendment)**
**All Individual Defendants**

69.    Each of the Paragraphs of this Complaint is incorporated herein.

70.    In the manner more fully described above, Defendants each had a reasonable opportunity to prevent the violation of Christian's constitutional rights as set forth above had they been so inclined, but they failed to do so.

71.    Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Christian's rights.

72.    As a direct and proximate result of the failures referenced above, Christian's rights were violated and he suffered injuries, including but not limited to physical pain and suffering, emotional distress, and death.

## COUNT IV
### 740 ILCS 180/1 – Wrongful Death
### All Individual Defendants and Defendant Caruana

73.     Each of the Paragraphs of this Complaint is incorporated herein.

74.     In the manner more fully described above, the actions of Defendants breached the duty of care owed to detainees in their custody and care. They did so by ignoring Christian's clear medical condition and emergency.

75.     Alternatively, the actions of the Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

76.     As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Christian suffered injuries, including death.

77.     Defendants' actions were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

78.     Defendants' actions proximately caused Christian's serious bodily harm and death, as well as great pain and suffering.

79.     Plaintiff Pamela Littrell, and all other legally recognized family members, claim damages for the wrongful death of Mr. Littrell, and for the loss of his services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel and advice, and for

the mental anguish caused by this loss, as well as for funeral expenses pursuant to 740 ILCS 180/1, the Illinois Wrongful Death Act.

## COUNT V
### 755 ILCS 5/27-6 – Survival Action
### All Individual Defendants and Defendant Caruana

80.    Each of the Paragraphs of this Complaint is incorporated herein.

81.    In the manner more fully described above, the actions of the Defendants breached the duty of care owed to detainees in their care. They did so by ignoring Christian's medical emergency.

82.    Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

83.    The misconduct described in this Count was undertaken with intentional disregard of Christian's rights.

84.    As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Christian suffered great conscious pain and suffering prior to his death.

85.    Christian filed no action during his lifetime, but under the law of the State of Illinois, this action survives and may be asserted by his Estate.

86.    Plaintiff Pamela Littrell, on behalf of the Estate of Christian Littrell, claims damages for the conscious pain and suffering of Mr. Littrell, pursuant to 755 ILCS 5/27-6, commonly referred to as the Illinois Survival Act.

## COUNT VI
### 42 U.S.C. § 12132 – Americans with Disabilities Act
### Defendants Caruana and the Board

87.     Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

88.     Congress enacted the Americans with Disabilities Act ("ADA") "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

89.     To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

90.     The Winnebago County Sheriff's Department and the Board of Trustees of the University of Illinois are public entities as defined in 42 U.S.C. § 12131(1).

91.     Christian had a disability—OUD—within the meaning of the Americans with Disabilities Act. He was otherwise qualified to participate in programs, services, or benefits offered by the U of I (which is controlled by the Board) and the Sheriff's Department, including but not limited to access to medical and mental health services.

92.     Despite Christian's known disability, the Department and the Board failed to reasonably accommodate his disability and prevented him from participating in healthcare

programs, services, or benefits, and discriminated against him, as described above. As a result of the Defendants' conduct, Christian suffered injuries, including pain, suffering, and death.

93. Defendants provide necessary medications to treat other types of diseases yet discriminated against Christian (and other patients with OUD) by refusing to provide him the medication for his chronic brain disorder that he needed.

94. Defendants' choice to withhold critical MOUD treatment from Christian and others in his situation was the direct result of discriminatory animus against those who suffer from OUD.

95. As a result of Defendants' conduct, Christian suffered injuries, including pain, suffering, and death.

96. Accordingly, the Defendants' conduct as alleged in the Complaint violated Title II of the Americans with Disabilities Act.

### COUNT VII
### 29 U.S.C. § 794 – Rehabilitation Act
### Defendants Caruana and the Board

97. Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

98. Christian had a disability—OUD—within the meaning of the Rehabilitation Act. When detained at WCJ, he was qualified to participate in programs, services, or benefits offered at the Jail, including but not limited to access to medical and mental health services.

99. Under the Rehabilitation Act, the Defendants are responsible for ensuring that individuals in custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

100.    The Winnebago County Sheriff's Department and the Board of Trustees of the University of Illinois both receive federal funding.

101.    Despite Christian's known disability, the Defendants failed to reasonably accommodate his disability against him as described above. As a result of the Defendants' conduct, Christian suffered injuries, including pain, suffering, and death.

102.    Accordingly, the Defendants' conduct as alleged in the Complaint violated the Rehabilitation Act.

**COUNT VIII**
**Indemnification**
**Defendant Winnebago County**

103.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

104.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

105.    The Individual Defendants are or were employees of the Winnebago County Sheriff's Department and the University of Illinois College of Medicine, acting as agents of the Winnebago County Sheriff's Department through the Board's contract with the Department.

106.    Winnebago County is therefore obligated to pay any judgment entered against the Individual Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Pamela Littrell, as Independent Administrator of the Estate of Christian Littrell, hereby respectfully requests that this Court enter judgment in her favor and against Defendants Winnebago County Sheriff Gary Caruana, the Board of Trustees of the University of Illinois, Brooke Mechling, Valerie Kidd, Amy Hall, Ryan Vandenbusch, Caroline

Z., Michael Marchini, and Winnebago County, awarding declaratory relief, compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated: August 6, 2024

Respectfully submitted,

/s/ Sarah Grady
Attorney for Plaintiff

Sarah Grady
Amelia Caramadre
David Howard Sinkman (*admission forthcoming*)
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, Illinois 60614
(312) 852-2184
sarah@kaplangrady.com
amelia@kaplangrady.com
sinkman@kaplangrady.com